**DECLARATION OF LANCE RAKE**

I, Lance Rake, declare as follows:

1. I make this Declaration in support of Buyer's Direct, Inc.'s ("BDI") Opposition to the Combined Motion for Summary Judgment and Judgment on the Pleadings (D.I. 31-34, "the Motion") filed by High Point Direct, LLC ("High Point") and Third Party Defendants Meijer, Inc., Sears Holdings Corporation, and Wal-Mart Stores, Inc.

2. I have reviewed U.S. Design Patent No. D598,183 ("the '183 Patent"), a copy of which is attached as Exhibit 1.

I. SUMMARY OF MY DECLARATION AND OPINIONS

3. I have been asked to describe the overall visual impression conveyed by the design claimed in the '183 Patent, and to articulate the various elements that comprise that visual impression. Additionally, I have been asked to provide my opinions concerning High Point's contentions that the '183 Patent would have been obvious to designer of ordinary skill in the art, and that the design of the '183 Patent is primarily functional.

4. As discussed below, it is my opinion that the '183 design patent is valid, as tests for anticipation, functionality and obviousness have not been met.

II. BACKGROUND AND QUALIFICATIONS

5. My professional background and qualifications are set forth in my curriculum vitae, which is attached as Exhibit 2. I have worked as an industrial designer continuously for 36 years since receiving my undergraduate degree in 1974. Since 1980, I have also enjoyed a career as a full-time faculty member at Auburn University, Carrington Technical Institute (Auckland, New Zealand), and the University of Kansas, where I hold the rank of Full Professor. My

1

responsibilities at the University of Kansas require me to direct 40% of my time to creative activity and research. In 1997, I conducted research with Dr. Phyllis Ragley on fencing shoe design as it relates to performance and injuries. This research led to a collaboration with Dr. Mark Geil on a study of fencing shoe design that was supported by the US Olympic Committee. This study included the conception and development of numerous design alternatives. Recently I developed a series of concepts for compression footwear to be worn by athletes immediately following endurance running events such as marathons, as a recovery aid.

III.  THE '183 PATENT

6. The '183 Patent describes a unique design for a slipper.

7. More specifically, the '183 Patent discloses a unique slipper/sock design comprising a smooth, unbroken surface that defines the upper body and also connects to the bottom surface to form one contiguous form.

8. The design further consists of a smooth outer surface in combination with a soft, fleece or pile lining, resulting in a distinctive silhouette. The silhouette of a product is significant because it is considered by designers as important in attracting consumers, and also as the primary method of identifying a shoe to a consumer.

9. The top surface of the '183 patent, as seen most clearly in FIGS 4 and 5, can be described as an "S Curve" that bends continuously with no flat spots or sharp angles. It begins from the bottom of the front of the slipper, moves upwards, turns to move back and slightly up, then the curves accelerates more quickly upwards until it terminates at the front part of the foot opening, which is the topmost part of the design. Importantly, there are no seams or breaks indicated on this complex curved surface.

10. The top, sides, back, and bottom surfaces claimed in the '183 design patent are contiguous. The only interruption in this otherwise unbroken surface is a vertical seam placed at

the center of the heel and a seam line (see FIGS. 4 and 5) that runs completely around the circumference of the sole or bottom of the slipper, and which is very close but slightly above the bottom of the product.

11. Further, there is no "welt" detail indicated in the '183 Patent. A welt is a strip between the sole and upper that is often seen as a raised area that breaks the surface continuity between the sole and the upper surfaces. As shown clearly in FIGS. 2, 3, 4, and 5, the transition between the upper surfaces and the sole depicted in the '183 Patent is smooth and continuous. These seams do not show visible stitch lines. There is no welt, and there is no hard edge in the design of the '183 Patent.

12. Another significant and unique visual feature of the '183 Patent is the size, shape, and relative location of the fleece-lined opening at the top-back area of the design. Seen in side views (FIGS. 4 and 5), the opening is slightly curved, and slightly higher towards the front of the slipper than the back. The opening, which functionally needs only to be large enough to insert the user's foot, is slightly greater than one-half of the total length of the product. The back part of the opening is located forward of the furthest rearward extent of the design-which happens to be at the bottom or sole of the slipper. This creates a forward "lean" to the heel area of the slipper.

13. The high-pile "fleece" interior material shown clearly in FIGS. 1-6 of the '183 Patent is shown projecting over and on top of the top and side surfaces of the '183 Patent, but does not significantly overhang these surfaces.

14. I have also considered the overall visual impression articulated by High Point in its Memorandum. High Point's explanation is overly simplistic, misleading, and focuses on specific design details as opposed to the overall visual image.

3

15. For example, High Point states that "another overall effect is created by the presence of a bottom element having a thickness which is visible from all directions." Verbal descriptions are often either too broad or too narrow to fully capture every element of a design. While words are capable of listing some, or even all, of the individual features of the drawings, they are simply ill-suited for communicating the overall appearance of all of the elements, including the relative and spatial relationships of each and every solid line in the claim. In this example, the verbalizations inaccurately convey the design intent of the lines that roughly parallel the bottom of the design, creating what High Point describes as "a bottom element having a thickness which is visible from all directions." This line does not describe the top of a "bottom element"- it is meant to be simply a hidden seam line, nearly imperceptible in practice. A misinterpretation of the line that parallels the bottom of the '183 patent led to a misunderstanding that this line defines the top edge of a traditional "sole."

16. The '183 Patent includes two embodiments of the sole or bottom of the slipper, indicated in FIGS. 7 and 8.  FIG. 7 indicates a pattern of small dots, and FIG. 8 is plain.  I understand this to mean that the '183 Patent claims the design of the sole with or without the added ornamentation of a pattern of dots.

IV. <u>GUIDING LEGAL PRINCIPLES</u>

17. I have been informed by counsel that a design patent may be obvious if one of ordinary skill would have combined the teachings of the prior art to create the same overall visual appearance as the claimed design.

18. I understand that in evaluating obviousness, a so-called "primary reference" must first be identified.  A primary reference is an article, the design characteristics of which are basically the same as the claimed design.  The primary reference must create basically the same

4

visual impression as the claimed design, which requires consideration of the claimed design as a whole, as opposed to the discrete elements of the design.

19. Once a primary reference has been identified, other references may be used to modify the reference to create a design that has the same overall visual appearance as the claimed design. However, these so-called "secondary references" may only be used to modify the primary reference if they are "so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other."

20. I understand that once that once this hypothetical piece of prior art has been constructed, the "ordinary observer test" is applied. I am informed by counsel that the ordinary observer test considers whether two designs are "substantially the same," i.e., when, giving such attention as purchaser usually gives, the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other.

21. I am further informed that a design for an article of manufacture that is dictated primarily by function cannot be the subject of a design patent. One example of a dictated design is that portion of a key that enters a lock. Its appearance is dictated by the internal mechanism within the lock. It can have only one appearance and any change in the form of that portion of the key will render it non-functional. However, the other portion of a key is not functional in this sense, since it can have many shapes (round, circular, oval, etc.) so long as it can accommodate a user's hand.

V. <u>INVALIDITY</u>

22. I understand that High Point contends that the '183 Patent is invalid as obvious based upon two shoes that it says were sold prior to the filing of the '183 Patent. Photographs of the these shoes, referred to by High Point as the Penta and Laurel Hill designs ("the Woolrich Products"), are attached as Exhibits 3 and 4, respectively.

23.     The overall visual impression created by the design of the '183 Patent is described above.  There are significant differences between this visual impression and the Woolrich Products.

24.     Exhibit 5 shows a comparison between FIG. 1 of the '183 Patent and comparable perspective views of the Woolrich Products.  In this view we notice two distinct differences: The high sidewall (under the ankle), and the visually dominant "rolled collar" that appears on the Woolrich Products and is absent on the '183 Patent. The collar in the Woolrich Products is the result of a design detail where the interior pile or fleece material is rolled over the foot opening and is essentially turned inside-out. This detail then follows the outside surface around the foot opening for about an inch-creating a soft, double-thick detail around the foot opening. This also clearly indicated in Exhibit 4.  In contrast, the claim of the '183 Patent does not show this detail. Instead, the material in the '183 Patent is single thick, cut to the shape of the foot opening, with the fleece material randomly extending inward and up over the sides (but not turned inside-out or rolled over).

25.     Further, the "Penta" design (Exhibit 3) indicates a visually dominant raised "welt" detail that extends around the perimeter of the slipper.  This detail includes a visible stitch detail (which is not claimed in the '183 Patent) and is located above a thick flat sole detail.  The sole of the '183 Patent, in contrast, is contiguous with the sides and top.  Although there is a perimeter seam line, surfaces are indicated as tangent and smooth.  The sole detail of the Laurel Hill design does not have a welt, but it does have a tick sole detail that projects horizontally and visually terminates the design.  This is a significant difference between the '183 Patent and the Woolrich Products.  The description of SNOOZES included as Exhibit 6 of this Report explains why these designs look so different: "snoozies are not socks and they're not slippers- sort of a crossover

510651.1

between the two and that's why we call them 'foot coverings'!" If we think of the '183 Patent describing and claiming a slipper-sock and the Woolrich Products as more like slipper-shoes, it is easier to understand the significance of the differences.

26. The bottom of the slipper, shown in Exhibit 7 is also very different. As previously stated, the '183 Patent describes two embodiments, one with a smooth sole contiguous with all other surfaces. The other embodiment is also a smooth, contiguous surface, but with a pattern of round dots in two groups. The prior art example of the Penta and Laurel Hill are clearly separate surfaces, graphically textured over most of the sole, with a dominant stitch line detail.

27. In no way do these designs resemble the design claim of the '183 Patent. Accordingly, it is my opinion that the Woolrich Prior Art does not convey the same overall visual impression as the '183 Patent.

28. However, even if a court were to conclude that the Woolrich Prior Art did convey the same overall visual impression as the '183 Patent to qualify as a primary reference, it is my opinion that a designer of ordinary skill in the art would not be able to combine the soles described in the '517 and '934 Patents with the Woolrich Penta and Laurel Hill designs and recreate the claim of the '183 Patent. I believe that the references are so different in style and design intent that, in any combination, they could not anticipate the '183 Patent.

29. It is important to understand that the '183 design patent does not claim a "sole" detail at all. It might be easier to understand the claimed design as a sock with surfaces that wrap continuously around the foot. These surfaces are essentially unbroken and contiguous. This is a completely different design intent than the more traditional upper-sole configuration of the Woolrich prior art and described in the '517 and '934 Patents. The dot patterns described in the

7

'517 and '934 Patents are clearly a part of a sole and not applied independently to the bottom of a sock/slipper design. In my opinion, it would not be obvious to a designer of ordinary skill in the art to combine completely different design concepts into one design as claimed in the '183 Patent.

## VI.     FUNCTIONALITY

30.     A slipper cannot be any shape.  It cannot, for example be smaller than a person's foot.  It can certainly be larger than a person's foot, and the shape does not have to mimic the contour or silhouette of the foot (there can be slippers with pointed toes, or animal head shapes, for example).  The shape of a slipper must conform to the shape of a foot, but foot shape only determines the minimum size and shape.  There must be an opening in the slipper of sufficient size to insert the user's foot, but this opening can vary substantially in size and shape and still perform its required function.  Seams and stitch patterns perform a function, but their shape, placement, and design will have a significant bearing on the overall appearance of the product.

31.     The '183 Patent discloses an ornamental design for a slipper. The claims of the '183 Patent include all exterior surfaces, and describe a "fleece" texture on the interior surfaces. No features are indicated in broken lines, which I am informed describes subject matter that is not part of the claimed design.  FIGS. 7 and 8 show two different embodiments of the claim, one with a pattern of "dots" on the bottom, and one without.

32.     The pattern of dots indicated in FIG. 7 of the '183 patent are not functional. The dots indicated in FIG. 7 could be made of smooth, slippery material as easily as high-tack material. Even in a high-tack material, it is important to note that this ornamental dot pattern is no more functional that a crosshatch pattern, a series of straight or wavy lines, or a wide range of alternative graphic designs.

510651.1

33. If we compare the second embodiment of the '183 design patent with prior art depicted in the '517 and '934 Patents as shown in Exhibit 8, we see some similarities, but also some major distinctions. The round forms are similar, but the organizational groupings are very different. Most importantly, the dot pattern of the '183 Patent is not confined within a perimeter. That is, the dots are individual shapes place in a field. The designs revealed in the '517 Patent show the dots surrounded by an unbroken line, meaning that the dots are a pattern on another surface, quite possibly resulting in a drastically different appearance. It is also important to note that the dot pattern of the '183 Patent, when practiced in the SNOOZIES product is executed in clear material, so that the dots, which look visually strong when indicated as unbroken lines in the '183 Patent, are hardly noticeable as clear dots.

## VII. CONCLUSION

34. It is my opinion that the '183 Patent design has a substantially different overall visual appearance from the prior art provided by High Point. I can find no reason to conclude that a designer of ordinary skill in the art would find it obvious to combine the claims of the '517 and '934 Patents with the designs of the Woolrich designs. Based upon the comparison of the claims of the patent drawings to photographs of the Woolrich prior art examples, and using my many years of experience as a design practitioner and educator, I am confident that an ordinary observer, familiar with the prior art and given such attention as a purchaser usually gives, would not find the prior art designs substantially similar in overall appearance. Further, it is very difficult to conclude that any of the ornamental design features of the '183 Patent are purely functional. There is a fundamental and critical distinction between a feature having a function, on one hand, and a feature having a design which is "purely functional" (i.e. "dictated by its function alone").

35. I understand that additional information may be forthcoming that may require me to amend or supplement my opinions.

36. In compliance with Federal Rule of Evidence 702, my opinion is based upon sufficient facts or data, it is the product of reliable principles and methods, and I have applied the principles and methods reliably to the facts of this case.

Respectfully submitted,

_____         17 APR 12
Lance G. Rake, IDSA                    Date

510651.1