# United States Court of Appeals
# for the Federal Circuit

———————————

**HIGH POINT DESIGN LLC,**
*Plaintiff/Counterclaim Defendant-Appellee,*

**AND**

**MEIJER, INC., SEARS HOLDINGS CORPORATION,**
**AND WAL-MART STORES, INC.,**
*Third Party Defendants-Appellees,*

**v.**

**BUYERS DIRECT, INC.,**
*Defendant/Counterclaimant-Appellant.*

———————————

2012-1455

———————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: September 11, 2013

Appeal from the United States District Court for the
Southern District of New York in No. 11-CV-4530, Judge
Katherine B. Forrest.

———————————

Decided: September 11, 2013

———————————

JEFFREY M. KADEN, Gottlieb Rackman & Reisman,
P.C., of New York, New York, argued for plain-
tiff/counterclaim defendant-appellee and third-party
defendants-appellees. With him on the brief were DAVID
S. KASHMAN and STEVEN STERN.

2                    HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.

ANDREW M. OLLIS, Oblon, Spivak, McClelland, Maier & Neustdt L.L.P., of Alexadria, Virginia, argued for defendant/counterclaimant-appellant. With him on the brief were FRANK J. WEST and PHILIPPE J.C. SIGNORE.

———————————

Before O'MALLEY, SCHALL, and WALLACH, *Circuit Judges*.

SCHALL, *Circuit Judge*.

Buyer's Direct, Inc. ("BDI") appeals from a final judgment of the United States District Court for the Southern District of New York holding BDI's asserted design patent invalid on summary judgment and also dismissing BDI's trade dress claims with prejudice. *See High Point Design LLC v. Buyer's Direct, Inc.*, No. 11-CV-4530, 2012 WL 1820565 (S.D.N.Y. May 15, 2012) ("*Final Decision*"). For the reasons set forth below, we *reverse* the grant of summary judgment of invalidity, *vacate* the dismissal of BDI's trade dress claims, and *remand* for further proceedings consistent with this opinion.

BACKGROUND

I. BDI AND THE '183 PATENT

BDI is the owner of U.S. Design Patent No. D598,183 (the "'183 patent") and the manufacturer of slippers known as SNOOZIES®. An exemplary pair of SNOOZIES® slippers is shown below:



The '183 patent recites one claim, for "the ornamental design for a slipper, as shown and described." Two of the drawings included in the '183 patent are shown below:



FIG. 1

4                    HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.



FIG. 4

As additional design features, the '183 patent disclos-
es two different soles: a smooth bottom (as shown in
Figure 8) and a sole with two groups of raised dots (as
shown in Figure 7):



FIG. 8                           FIG. 7

BDI alleges that SNOOZIES® are an embodiment of the
design disclosed in the '183 patent.

## II. The Relationship Between the Parties

High Point Design LLC ("High Point") manufactures and distributes the accused FUZZY BABBA® slippers, which are sold through various retailers, including appellees Meijer, Inc., Sears Holdings Corporation, and Wal-Mart Stores, Inc. (collectively, the "Retail Entities"). An exemplary pair of FUZZY BABBA® slippers is shown below:



On June 22, 2011, after becoming aware of the manufacturing and sale of FUZZY BABBA® slippers, BDI sent High Point a cease and desist letter, in which BDI asserted infringement of the '183 patent. With a responsive letter sent on July 6, 2011, High Point included a copy of a complaint for declaratory judgment that it had filed five days earlier in federal district court.[1] In the complaint, High Point alleged (1) that the manufacturing and sale of FUZZY BABBA® slippers did not infringe the '183 patent and (2) that the '183 patent is invalid and/or unenforceable.

In its answer to High Point's declaratory judgment complaint, filed on December 29, 2011, BDI lodged counterclaims for infringement of the '183 patent and for

---

[1]   High Point did not immediately serve the complaint on BDI.

infringement of the trade dress found in BDI's
SNOOZIES® slippers. That same day, BDI filed a third-
party complaint alleging that the Retail Entities infringed
the '183 patent and infringed BDI's trade dress based on
sales of High Point's FUZZY BABBA® slippers.

### III. The District Court Proceedings

In a scheduling order that issued on February 28,
2012, the district court set March 16, 2012, as the dead-
line for the parties to amend their pleadings. BDI did not
seek to amend its pleadings by that date. Four days after
that deadline, High Point and the Retail Entities filed a
combined motion seeking (1) summary judgment of inva-
lidity and noninfringement of the '183 patent and (2)
judgment on the pleadings with respect to BDI's trade
dress claims. With its opposition to the motion, BDI
included the declaration of an expert named Lance Rake,
who opined that the '183 patent was not invalid because
the "tests for anticipation, functionality and obviousness
have not been met." *See* J.A. 455. BDI also included
amended pleadings with proposed amendments adding
additional assertions as to the trade dress at issue in
BDI's trade dress claims.

On May 15, 2012, the district court granted the mo-
tion for summary judgment, holding the '183 patent
invalid on the ground that the design claimed in it was
both (1) obvious in light of the prior art and (2) primarily
functional rather than primarily ornamental. *See Final
Decision*, 2012 WL 1820565, at *3–5. As to the obvious-
ness ruling, the district court made various findings. The
court characterized the '183 patent as disclosing "slippers
with an opening for a foot that contain a fuzzy (fleece)
lining and have a smooth outer surface." *Id.* at *1. As to
the prior art, the court found that a consumer apparel
company, known as Woolrich, had, prior to the effective
filing date of the '183 patent, sold two different models of
footwear: the "Penta" and the "Laurel Hill" (collectively,
the "Woolrich Prior Art"). *Id.* at *2. The Penta and the
Laurel Hill models are shown in photographs below:

HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.                    7



FIG. 1



FIG. 4

J.A. 486–87 (Penta).

8 HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.



FIG. 1



FIG. 4

J.A. 490–91 (Laurel Hill). The court found that the Penta "looks indistinguishable from the drawing shown in the '183 Patent," and that the Laurel Hill, "while having certain differences with the Penta slipper that are insubstantial and might be referred to as streamlining, nonetheless has the precise look that an ordinary observer would think of as a physical embodiment of the drawings shown on the '183 Patent." *Final Decision*, 2012 WL 1820565, at *2.

The district court also identified two secondary references—U.S. Design Patent Nos. D566,934 and D540,517 (collectively, the "Secondary References")—that disclose "slippers with a pattern of small dots on the bottom

surface." *Final Decision*, 2012 WL 1820565, at *2. Representative drawings from the Secondary References are shown below:



*FIG. 1*

U.S. Design Patent No. D566,934 fig. 1.



FIG. 1

U.S. Design Patent No. D540,517 fig. 1. Based on these findings, the court concluded that the design in the '183 patent was invalid as obvious:

> The overall visual effect created by the Woolrich prior art is the same overall visual effect created by the '183 patent. To an ordinary observer, they are the same slippers. The only difference between the slippers relates to the sole of the slippers, which is quite minor in the context of the overall slipper. Even if, however, this Court were

to find that the differences in the sole design were
of any note, the design of the dots on the '183 pa-
tent are anticipated by the dots on the [Secondary
References].

   Since both of those design patents were noted
on the face of the '183 patent, and since both re-
late to slippers, they would have been available to
a slipper designer skilled in the art—and would
have easily suggested the addition of "dots" to the
sole of a slipper. Combining the dots shown on
those two design patents with the prior art in the
Woolrich slipper would have been obvious to any
designer. That combination would have created a
slipper with a virtually identical visual impres-
sion as [the] '183 patent.

*Final Decision*, 2012 WL 1820565, at *4–5.

   As to the second, and alternative, basis for invalidi-
ty—based on the alleged functionality of the design in the
'183 patent—the district court concluded that "all major
characteristics of th[e] slipper [in the '183 patent] are
functional." *Id.* at *5. Specifically, the court identified
various design features and the functions those features
allegedly perform:

   It is a slipper that completely covers the foot; that
   is a functional design to provide complete foot
   warmth and protection. That's the primary func-
   tion of innumerable slippers. The slipper at issue
   has a fuzzy interior for comfort—again, a func-
   tional characteristic that many slippers share.
   The fuzz overflows can be characterized as "orna-
   mental," but can also be characterized as func-
   tional—i.e., as providing an extra element of
   comfort. It certainly cannot be said that the slip-
   per shown in the '183 patent drawings is "primari-
   ly ornamental."

*Id.* With that, the court held the claims invalid as pri-
marily functional.

In the *Final Decision*, the district court also dismissed BDI's trade dress claims with prejudice. *Id.* at \*6. The court found that the original trade dress claims (i.e., prior to the proposed amendments) were inadequate as a matter of law for failure to sufficiently identify the trade dress at issue. *Id.* As to the proposed amendments, the court stated: "At this stage of the litigation, the Court is unwilling to entertain an amendment to the pleadings and therefore dismisses this claim with prejudice." *Id.*

Having held the '183 patent invalid, the district court dismissed BDI's claims for infringement and entered judgment in favor of High Point and the Retail Entities. *Id.* BDI timely appealed from the district court's rulings. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I. STANDARDS OF REVIEW

On appeal, BDI challenges both the grant of summary judgment of invalidity and the dismissal with prejudice of its trade dress claims. This court reviews a district court's grant of summary judgment under the law of the regional circuit. *Broadcast Innovation, L.L.C. v. Charter Commc'ns, Inc.*, 420 F.3d 1364, 1366 (Fed. Cir. 2005). The Second Circuit reviews a grant of summary judgment without deference, construing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011). Summary judgment may only be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When reviewing procedural issues not unique to this court's jurisdiction, such as a motion to amend the pleadings, we apply the law of the regional circuit. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1354 (Fed. Cir. 2009). The Second Circuit reviews the denial of an untimely request to amend a pleading for

an abuse of discretion. *See Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009).

We first consider the grant of summary judgment of invalidity on the design patent claims.

## II. INVALIDITY BASED ON OBVIOUSNESS

### A.

When assessing the potential obviousness of a design patent, a finder of fact employs two distinct steps: first, "one must find a single reference, a something in existence, the design characteristics of which are basically the same as the claimed design"; second, "[o]nce this primary reference is found, other references may be used to modify it to create a design that has the same overall visual appearance as the claimed design." *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (internal quotations omitted); *see also Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1329 (Fed. Cir. 2012).

Under the first step, a court must both "(1) discern the correct visual impression created by the patented design as a whole; and (2) determine whether there is a single reference that creates 'basically the same' visual impression." *Durling*, 101 F.3d at 103. The ultimate inquiry in an obviousness analysis is "whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Id.*, *quoted in Apple*, 678 F.3d at 1329.

### B.

BDI asserts that the district court erred by using the Woolrich Prior Art as primary references because their design characteristics are not "basically the same as the claimed design," as required under the first step set forth in *Durling*. Specifically, BDI relies on the Rake Declaration to argue that various design features distinguish the '183 patent from the Woolrich Prior Art, including differences in (1) the fleece collars, (2) the height of the sidewalls, and (3) the thickness of the soles. According to

BDI, these alleged differences create genuine issues of material facts as to whether the Woolrich Prior Art can properly serve as primary references.

Next, BDI asserts that the district court identified no motivation to modify the Woolrich Prior Art to achieve the "same overall visual appearance as the claimed design," as required under the second step set forth in *Durling*. According to BDI, the court erred by ignoring the design features that distinguish the '183 patent from the Woolrich Prior Art, and finding that the only differences relate to the soles.

BDI also argues that the district court failed to perform a proper obviousness analysis. First, BDI asserts that the court erred by applying an "ordinary observer" standard, because this court's case law requires application of an "ordinary designer" standard in an obviousness analysis relating to a design patent. *See Final Decision*, 2012 WL 1820565, at *4 ("To an ordinary observer, they are the same slippers."); *see also id.* at *5 (rejecting the Rake Declaration because it "does not get [BDI] over the hurdle of the ordinary observer test"). Second, BDI argues that the district court failed to properly communicate its reasoning in either step of the obviousness analysis. Finally, BDI asserts that the court erred by not addressing secondary considerations, including copying and commercial sales.

In response, High Point and the Retail Entities (collectively, the "Appellees") assert that either the Penta or the Laurel Hill could act as the primary reference for the obviousness analysis because they are both "basically the same as the claimed design," which, according to the Appellees, is all that is required under the first step. The Appellees assert that BDI seeks to apply a "virtual identity" standard in the first step, rather than the proper standard, which allows for minor differences. According to the Appellees, under this court's case law, a district court can assess the "overall visual appearance," as re-

14          HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.

quired by the second step under *Durling*, without expert testimony and "almost instinctively."

The Appellees also argue that the district court properly discounted the Rake Declaration because obviousness should be assessed from the vantage point of the ordinary observer, not an ordinary designer such as Mr. Rake. According to the Appellees, the district court properly applied the ordinary observer standard to find obviousness based on the combination of either the Penta or the Laurel Hill with the Secondary References.

As to secondary considerations, the Appellees argue that BDI failed to show the nexus necessary to demonstrate that either the alleged copying or the commercial sale of SNOOZIES® support the nonobviousness of the '183 patent. Specifically, the Appellees assert that BDI has not established that SNOOZIES® actually embody the '183 patent, as is necessary to support BDI's nonobviousness arguments.

C.

We first address the standard applied by the district court here. The use of an "ordinary observer" standard to assess the potential obviousness of a design patent runs contrary to the precedent of this court and our predecessor court, under which the obviousness of a design patent must, instead, be assessed from the viewpoint of an ordinary designer. *See Apple*, 678 F.3d at 1329 ("In addressing a claim of obviousness in a design patent, 'the ultimate inquiry . . . is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved.'") (quoting *Durling*, 101 F.3d at 103); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380–81 (Fed. Cir. 2009) (same); *In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("The central inquiry in analyzing an ornamental design for obviousness is whether the design would have been obvious to 'a designer of ordinary skill who designs articles of the type involved.'") (quoting *Avia Grp. Int'l, Inc. v. L.A. Gear Cal.,*

*Inc.*, 853 F.2d 1557, 1564 (Fed. Cir. 1988), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc)); *In re Nalbandian*, 661 F.2d 1214, 1216 (CCPA 1981) (explicitly rejecting the "ordinary observer" standard for assessing the obviousness of design patents, as set forth in *In re Laverne*, 356 F.2d 1003 (CCPA 1966), and holding: "In design [patent] cases we will consider the fictitious person identified in § 103 as 'one of ordinary skill in the art' to be the designer of ordinary capability who designs articles of the type presented in the application."); *see also L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993) ("In applying the law of § 103 to the particular facts pertinent to the patented design, obviousness *vel non* is reviewed from the viewpoint of a designer of ordinary skill or capability in the field to which the design pertains.") (citing *Nalbandian,* 661 F.2d at 1216). Given this precedent, the district court erred in applying the ordinary observer standard to assess the obviousness of the design patent at issue.[2]

Although obviousness is assessed from the vantage point of an ordinary designer in the art, "an expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling." *Avia Grp.*, 853 F.2d at 1564. That said, an expert's opinion may be relevant to the

---

[2]    We do not believe our decision in *International Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009), cited by the district court, compels a contrary conclusion. The *International Seaway* court may in fact have had the "designer of ordinary skill" standard in mind when it used the term "ordinary observer." In any event, the court could not rewrite precedent setting forth the designer of ordinary skill standard. *See Vas Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991); *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.3d 757, 765 (Fed. Cir. 1998).

factual aspects of the analysis leading to that legal con-clusion. *See Peterson Mfg. Co. v. Cent. Publ'g, Inc.*, 740 F.2d 1541, 1547 (Fed. Cir. 1984), *abrogated on other grounds by Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 899 F.2d 1171, 1177–78 (Fed. Cir. 1990) ("In civil litigation involving a design [patent], an expert's testimony is most helpful, as in the determina-tion of obviousness with respect to any other type of invention, to explain the technology, the scope and con-tent of the prior art, the differences between the prior art and the invention, and the level of skill in the art."). For that reason, the district court erred by categorically disregarding the Rake Declaration. *See Final Decision*, 2012 WL 1820565, at *5.

We now turn to what we conclude were additional er-rors in the district court's application of the two-step analysis set forth in *Durling*. As to the first part of the first step—"discern[ing] the correct visual impression created by the patented design as a whole"—the district court erred by failing to translate the design of the '183 patent into a verbal description. *See Durling*, 101 F.3d at 103 ("From this translation, the parties and appellate courts can discern the internal reasoning employed by the trial court to reach its decision as to whether or not a prior art design is basically the same as the claimed design."). The closest to the necessary description was the court's comment characterizing the design in the '183 patent as "slippers with an opening for a foot that can contain a fuzzy (fleece) lining and have a smooth outer surface." *Final Decision*, 2012 WL 1820565, at *1; *see also id.* at *2 ("The slipper shown has a smooth exterior and a fuzzy interior."). This, however, represents "too high a level of abstraction" by failing to focus "on the distinctive visual appearances of the reference and the claimed design." *Apple*, 678 F.3d at 1331–32; *see also Durling*, 101 F.3d at 104 ("The error in the district court's approach is that it construed [the] claimed design too broadly. The district court's verbal description of [the] claimed design does not evoke a visual image consonant with the claimed

design. Instead, the district court's description merely represents the general concept of a sectional sofa with integrated end tables."). On remand, the district court should add sufficient detail to its verbal description of the claimed design to evoke a visual image consonant with that design. *See Durling*, 101 F.3d at 103–04 (describing the necessary process).

As to the second part of the first step—"determin[ing] whether there is a single reference that creates 'basically the same' visual impression"—the court erred by failing to provide its reasoning, as required under this court's precedent. *See id.* at 103 ("[T]he judge must communicate the reasoning behind the decision. This explanation affords the parties a basis upon which to challenge, and also aids the appellate court in reviewing, the judge's ultimate decision."). Absent such reasoning, we cannot discern how the district court concluded that the Woolrich Prior Art was "basically the same as the claimed design," so that either design could act as a primary reference. On remand, the district court should do a side-by-side comparison of the two designs to determine if they create the same visual impression. *See, e.g., Apple*, 678 F.3d at 1330 (comparing images of the claimed design to images of the asserted primary references); *Titan Tire*, 566 F.3d at 1375, 1382–83 (same); *Durling*, 101 F.3d at 102 (same); *Borden*, 90 F.3d at 1572–73 (same); *In re Harvey*, 12 F.3d 1061, 1067–68 (Fed. Cir. 1993) (same); *In re Rosen*, 673 F.2d 388, 389 (CCPA 1982) (same); *Nalbanian*, 661 F.2d at 1215 (same). In addition, based on the record before us, there appear to be genuine issues of material fact as to whether the Woolrich Prior Art are, in fact, proper primary references. For this additional reason, summary judgment must be reversed. *See Durling*, 101 F.3d at 105 ("Without . . . a primary reference, it is improper to invalidate a design patent on grounds of obviousness.").

To the extent that the obviousness of the '183 patent remains at issue on remand, the district court will, after properly completing the first step under *Durling*, be in a

better position to assess whether or not the Woolrich Prior Art, modified by the Secondary References, provide a design with the "same overall visual appearance as the claimed design," as required under the second step of *Durling*.[3]  *See Durling*, 101 F.3d at 103.

Finally, we turn to secondary considerations, which the district court did not address in the *Final Decision*. This court has held that "evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983); *see also Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997) ("Invalidity based on obviousness of a patented design is determined on factual criteria similar to those that have been developed as analytical tools for reviewing the validity of a utility patent under § 103, that is, on application of the *Graham* factors.").  Here, BDI alleged both commercial success of the claimed design as well as copying.  To the extent that the obviousness of the '183 patent remains at issue on remand, the district court should address any evidence of secondary considerations.

For the foregoing reasons, we reverse the grant of summary judgment of obviousness and remand the case to the district court.

### III. INVALIDITY BASED ON FUNCTIONALITY

#### A.

An inventor can, upon meeting all statutory requirements, obtain a design patent for "any new, original and *ornamental* design for an article of manufacture . . . ." 35

---

[3]  Having setting forth the proper framework for the obviousness analysis, we take no position on whether the district court could or should find obviousness under the proper standard.

U.S.C. § 171 (emphasis added). Based on this requirement, a design patent can be declared invalid if the claimed design is "primarily functional" rather than "primarily ornamental," i.e., if "the claimed design is 'dictated by' the utilitarian purpose of the article." *See L.A. Gear,* 988 F.2d at 1123; *see also Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002) (characterizing the "dictated by" standard as a "stringent" one); *Hupp*, 122 F.3d at 1460 ("A design or shape that is entirely functional, without ornamental or decorative aspect, does not meet the statutory criteria of a design patent."). When performing this assessment, a court should view the claimed design "in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article . . . ." *L.A. Gear*, 988 F.2d at 1123; *see also Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997) ("While analyzing elements of the design may be appropriate in some circumstances, the determination of whether the patented design is dictated by the function of the article of manufacture must ultimately rest on an analysis of its overall appearance.").

Assessing various factors may help determine whether a claimed design, as a whole, is "dictated by" functional considerations:

> [1] whether the protected design represents the best design; [2] whether alternative designs would adversely affect the utility of the specified article; [3] whether there are any concomitant utility patents; [4] whether the advertising touts particular features of the design as having specific utility; [5] and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*PHG Techs., LLC v. St. John Cos.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006) (quoting *Berry Sterling*, 122 F.3d at 1456).

### B.

On appeal, BDI argues that the district court erred by finding the claimed design invalid merely because the design contains elements that perform functions. BDI asserts that consideration of the second, third, and fifth factors from *PHG Technologies* compels the conclusion that the claimed design is primarily ornamental. As to the second factor, BDI asserts that various catalogs show numerous alternative slipper and shoe designs that adequately perform the goal of warming a foot. As to the third factor, BDI argues that no utility patents cover SNOOZIES®. Finally, as to the fifth factor, BDI contends that the overall appearance of any footwear has ornamental aspects that, although necessary to perform a function, can vary widely in both placement and design.

In response, the Appellees argue that the district court applied the correct standard to find the claimed design invalid as primarily functional. According to the Appellees, various aspects of the design are clearly "functional elements:" (1) the seam connects two components; (2) the curved front accommodates the foot; (3) the foot opening facilitates ingress and egress; (4) the forward lean of the heel keeps that part in place, and (5) the fleece provides warmth. The Appellees assert that the fourth point further supports the district court's conclusion because, in the Appellees' view, BDI's advertising touts "functional characteristics" of the SNOOZIES®. Finally, the Appellees argue that the presence of alternative designs is not dispositive as to functionality.

### C.

Instead of assessing whether the claimed design was "primarily functional" or "primarily ornamental," *see L.A. Gear,* 988 F.2d at 1123, the district court interpreted this court's case law to require it to determine whether the design's "primary features" can perform functions. *See Final Decision*, 2012 WL 1820565, at *5 (stating that the evidence "leaves little doubt that all major characteristics

of this slipper are functional"); *see also id.* ("It is a slipper that completely covers the foot; that is a functional design to provide complete foot warmth and protection. That's the primary function of innumerable slippers. The slipper at issue has a fuzzy interior for comfort—again, a functional characteristic that many slippers share."). This analysis contravenes this court's precedent:

> [A] distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture . . . .

*Avia Grp.*, 853 F.2d at 1563; *see also Hupp*, 122 F.3d at 1460 ("[T]he fact that the article of manufacture serves a function is a prerequisite of design patentability, not a defeat thereof. The function of the article itself must not be confused with 'functionality' of the design of the article."); *L.A. Gear*, 988 F.2d at 1123 ("[T]he utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent."). Because the district court applied the incorrect standard and because a reasonable jury could, under the correct standard, find the '183 patent not invalid based on functionality, we reverse the court's ruling that the '183 patent is invalid by reason of functionality. To the extent invalidity based on functionality remains at issue between the parties on remand, the district court should apply the standard set forth above.

## IV. DISMISSAL OF THE TRADE DRESS CLAIMS

### A.

When considering trade dress claims, which are not unique to the exclusive jurisdiction of this court, we defer to the law of the regional circuit in which the district court sits. *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1407 (Fed. Cir. 1997). Applying Supreme Court precedent, the Second Circuit has stated that

although "[t]rade dress 'originally included only the packaging, or dressing, of a product,' . . . it has been expanded to encompass . . . the design and configuration of the product itself." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000)). In a claim for trade dress infringement, like those lodged by BDI, a party essentially asserts that another party has misappropriated trade dress and thereby caused confusion as to the source of the product. *See Wal-Mart*, 529 U.S. at 209–10 (discussing 15 U.S.C. § 1125(a)(1)(A)[4]).

To properly state a claim for trade dress infringement in the Second Circuit, a party must set forth "'a precise expression of the characteristics and scope of the claimed trade dress.'" *Sherwood 48 Assocs. v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003) (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)); *see also Yurman Design*, 262 F.3d at 117–18 (holding that "a plaintiff asserting that a trade dress protects an entire line of different products must articulate the specific common elements sought to be protected," and that "the artistic combination of cable [jewelry] with

---

[4]    This section recites: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

other elements" did not sufficiently set forth the trade dress at issue).

BDI's original trade dress claims stated that SNOOZIES® "have a distinctive, immediately recognizable overall look and feel that constitutes protectable trade dress that distinguishes BDI's SNOOZIES® slippers from those of competitors." BDI filed its proposed amendments on April 20, 2012, in response to a motion for judgment on the pleadings filed on March 20, 2012, four days after the deadline for the parties to amend their claims. In those proposed amendments, BDI added the following description of the characteristics of its trade dress that it contends may be protectable:

> The protectable trade dress of the SNOOZIES slipper comprises: (1) a smooth, generally unbroken surface that defines an upper body, and which also connects to the bottom surface to form a contiguous form; (2) a seam line set slightly above the base which runs around the circumference of the bottom of the slipper, resulting in a smooth transition between upper and lower; (3) a distinctive curve that defines the front of the slipper, running from the bottom-front, upwards, and back across the front of the slipper before turning into an accelerated upward curve to the foot opening; (4) an oversized foot opening that is larger than functionally necessary; (5) a forward "lean" to the heel area; and (6) a protrusion of fleece material from the lining of the slipper over the sides.

J.A. 437 ¶ 25; J.A. 448 ¶ 44.

## B.

BDI asserts that the district court improperly dismissed its trade dress claims even though (1) substantial discovery remained, (2) the Appellees would not be prejudiced by the amendment of its pleadings, and (3) BDI offered its proposed amendments within 30 days of the motion for judgment on the pleadings. According to BDI,

the district court treated the proposed amendments as a motion to amend, for which the court should "freely give leave when justice so requires." *See* Fed. R. Civ. P. 15(a)(2); *see also Final Decision*, 2012 WL 1820565, at *6 ("At this stage of the litigation, the Court is unwilling to entertain an amendment to the pleadings and therefore dismisses this claim with prejudice."). The amendments should have been permitted, argues BDI, because they were neither futile nor prejudicial, and would not have delayed the procedural schedule.

According to the Appellees, the district court did not view the proposed amendments as a motion to amend, but rather as a motion to modify the scheduling order, under which BDI had to show "good cause" for the requested modification. Citing *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009), the Appellees argue that "the Second Circuit has routinely held that it is appropriate to deny leave to amend a pleading when the deadline set forth in the scheduling order has already passed, and the requesting party cannot meet the requirement under [Federal] Rule [of Civil Procedure] 16(b)(4) that a court's scheduling order shall *not* be modified except upon a showing of good cause." Appellee Br. 34. The Appellees argue that BDI has not shown good cause to modify the scheduling order to allow the proposed amendments after the deadline to amend pleadings because BDI did not diligently assess the legal requirements for pleading trade dress claims in the Second Circuit.

## C.

On appeal, the parties focus on the standards that they respectively believe the court should have applied when addressing BDI's request to amend its pleadings. As set forth below, we agree with the Appellees that the appropriate standard is Rule 16(b)'s good cause requirement. We therefore vacate and remand to the district court to determine whether that standard can now be satisfied given the now-ongoing nature of this litigation.

In *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000), Circuit Judge (now Justice) Sotomayor brought the Second Circuit in line with other circuits on the issue most pertinent to this case, holding that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *See also Holmes*, 568 F.3d at 334–35[5]; 6A Charles A. Wright et al., Federal Practice and Procedure § 1522.2 (3d ed. 1998) ("Indeed, to the extent that other federal rules, such as Rule 15 governing pleading amendments, contain a more lenient standard than good cause, the Rule 16(b) standard controls any decisions to alter a scheduling order for purposes of making pleading amendments and it must be satisfied before determining whether an amendment should be permitted under Rule 15.") (citing *Holmes*). None of the cases cited by BDI involve a party seeking to amend a pleading *after* the deadline set forth in a court-issued scheduling order.[6] It is this fact that distinguishes the situation here, and

---

[5] Although the analysis in *Holmes* discusses the need to "balance[]" Federal Rules 15(a) and 16(b), it is clear that the court assessed whether good cause existed. *See Holmes*, 568 F.3d at 335 ("The record is devoid of evidence supporting plaintiffs' contention that good cause existed for the District Court to modify its scheduling order. Accordingly, we affirm the District Court's denial of Holmes's motion to amend.").

[6] For example, *Hughes v. Anderson*, 449 F. App'x 49 (2d Cir. 2011)—on which BDI relies for the proposition that a district court cannot dismiss a claim with prejudice without providing notice, an opportunity to be heard, and an opportunity to file an amended pleading—dealt with a *sua sponte* dismissal by the district court on grounds not raised by the defendant. *Id.* at 51.

26        HIGH POINT DESIGN LLC v. BUYER'S DIRECT, INC.

necessitates, under *Parker* and *Holmes*, the application of the "good cause" standard.

As previously mentioned, according to Second Circuit law, we must determine whether the district court abused its discretion in denying BDI's motion to amend. *See Parker*, 204 F.3d at 339. As also noted above, in denying BDI's motion to amend its pleadings, the district court stated: "At this stage of the litigation, the Court is unwilling to entertain an amendment to the pleadings and therefore dismisses the claim with prejudice." *Final Decision*, 2012 WL 1820565, at *6. The district court's ruling did not explain whether it was refusing to allow BDI to amend its complaint under Rule 15(a)'s more lenient standard, or Rule 16(b)'s good cause standard. Even if the district court was implicitly applying the good cause standard under Rule 16(b), moreover, the court failed to explain why good cause did not exist under the circumstances here. Without some explanation of the district court's reasoning, we cannot properly assess whether an abuse of discretion occurred. *See Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 630 (2d Cir. 1991) (reviewing a district court's certification under Federal Rule of Civil Procedure 54(b), and stating, "[a]bsent an explanation by the district court, we have no basis for conducting a meaningful review of the district court's exercise of its discretion"); *see also S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986) (vacating a denial of attorney fees and remanding to provide sufficient reasoning to assess whether the court abused its discretion).

When assessing whether good cause has been shown, "the primary consideration is whether the moving party can demonstrate diligence." *See Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (citing *Parker*, 204 F.3d at 339–40); *see also Holmes*, 568 F.3d at 335 ("Whether good cause exists turns on the 'diligence of the moving party.'") (quoting *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)); *Parker*, 204 F.3d

at 340 ("[W]e agree with [other circuit] courts that a finding of 'good cause' depends on the diligence of the moving party."). A district court can, however, "consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner*, 496 F.3d at 244. A review of the Second Circuit case law from *Parker* forward reveals that notice of the asserted claim and prejudice to the non-moving party remain factors to consider in addition to the movant's diligence. The only explanation provided by the district court for its refusal to allow BDI's amendment was its timing vis-à-vis the "stage of litigation."

Accordingly, we vacate the district court's dismissal of the trade dress claim and remand for reconsideration. The court may now weigh High Point's notice of BDI's trade dress claim and initial belief that its original complaint encompassed such a claim and the absence of apparent prejudice to High Point against the fact that BDI had always been in possession of the information added in the proposed amendments and could have asked to clarify its pleading sooner. We also leave to the district court in the first instance the question of whether, if dismissal remains appropriate, that dismissal should be without prejudice.

## CONCLUSION

For the foregoing reasons, we *reverse* the grant of summary judgment of invalidity, *vacate* the dismissal of BDI's trade dress claims, and *remand* for further proceedings consistent with this opinion.

## REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED

### COSTS

Each party shall bear its own costs.